Good morning, ladies and gentlemen. You can see two of us here, and I wanted to make sure that you all knew that Judge Rovner is also with us by video, so you'll be able to see her from the podium when you're there. If you have any problems with the video, obviously let us know, but hopefully it will be fine. And our first case for this morning will be Aventine Renewable Energy against Glacial Lakes Energy. Mr. Rovner. Good morning, Your Honors, and may it please the Court. The District Court erred when it held that the ethanol producers that we're collectively referring to as Glacial Lakes were entitled to keep accepting all the benefits of their contracts with Aventine without performing their own obligations after Aventine breached. That was an error because under New York law, once Aventine breached, Glacial Lakes had a choice. It could either terminate the contracts right then and sue for complete breach, or it could affirm them by continuing to accept their benefits and sue for partial breach. But your opponents argue that New York doesn't regard this as the kind of claim that you can raise, that in fact it's not a doctrine that can be deployed essentially defensively. They do argue that, Your Honor, and they're incorrect. We've had six cases in our briefs between the opening and reply where the Court supplied the doctrine in exactly this posture, where the party who is alleged to have breached first was nonetheless allowed to sue itself for breach after the other party affirmed. My recollection is these are District Court cases, though? Are there, has the New York Court of Appeals ever said that? Your Honor, we don't cite any of the New York Court of Appeals cases in here, and I'm not aware of any fitting this factual scenario here. Our best case on this is the Second Circuit case. It's the ARP Films versus Marvel case. And in that case, it was this scenario because Marvel was the alleged first breacher. It allegedly breached a distribution by allowing someone else to distribute videocassettes when it was exclusive. It then brought a claim, and it was consolidated. It doesn't show up in the caption of the case, but at page 847, it recognizes that Marvel sued. After Marvel first breached, the ARP Films continued accepting the benefits by licensing, and then it refused to pay its royalties. Marvel, in this case, was allowed to sue for breach. It was awarded damages, and it reflects that in the opinion. And it was also given an accounting, which led to more damages. The Second Circuit opinion doesn't say how much damage is it said, but it said they were very substantial. So the Second Circuit is dead on point here. And then we've cited five District Court cases. You're right. All the rest are Federal District Court cases spanning about 30 years. But every single one of them fits this fact pattern. But fundamentally, in New York, before you get to remedy, you've got to show that as plaintiff, you were performing, and that's what didn't happen. So I guess I'm just going to say to alert you, the first set of questions I have relates to that. The second set of questions I have relates to how, when all was said and done after the bankruptcy, was your client injured by this? You've got the $2.3 million of stock that transfers, but it's hard to see how that hurt you. Your Honor, I'm happy to address those in that order. So let me start with liability first. And I've said that just the fact of the cases proves that we're actually right about this. But there are two more things on this. One is the absence of any authority on the other side. And the second is just the logic of the doctrine. Why isn't it more logical to see this as a case where you breached the contract by failing to make the true-up payments? And so the contract is breached. The contract is over. And now Glacier Lakes is using these rail cars in the absence of any contractual right to use them. Wouldn't that be a better theory for you? Because then you could actually look at quantum merit. You could look at unjust enrichment, which you can't do if there's a contract. If there's a contract, those equitable theories are unavailable. No, you're correct on that, Your Honor, that if there's a contract, quantum merit isn't available. And this wasn't ever pleaded out or litigated as quantum merit. The reason this is it is because, as I've said, New York law is very clear that once one party breached, the other party has a choice. They can either terminate right then or they can accept. But if they accept, then the contract's in force. So let me turn to logic here. And this is what the New York courts have said across a variety. They said this is an either-or. Either the contract is in force and binding or it's not. If it's binding, if you affirm it and keep accepting the benefits, then you have to perform. And they've said that again and again. But even though you're free to just not perform? I mean, that seems strange too. No, Your Honor. The way this works, my best reading of these cases in the doctrine is that once you're in this world where people are performing some obligations or not others, but none of them is rejecting the contract at that point. What the court has to do is it becomes element by element and duty by duty. So, for example, if Aventine had not performed on the rail car portion of this, if it hadn't let them use the rail cars, then of course it couldn't sue them for not paying it. But it did perform on that element. And that's the way that, you know, and this is where severability and partial performance sometimes overlap in these cases. But, you know, the ESPN case we cite where ESPN and baseball had a mix-up over the broadcast rights for baseball and football, people were breaching on both sides either ways. And what the court did is it sorted through on sort of a duty by duty issue and said, who performed on this and who can sue for breach? And it ordered damages on some elements, just one side and some on the other  And the cases are very, very clear that once you accept after a first breach, you're saying the contract is still there. Now they claim that this can only be asserted defensively. They cite no authority for it. None. There's not a single case that holds that in New York that they've cited or I've found on my own. And they cite three treatises on this, but those treatises, none of those treatises address the contract doctrine. Well, even in the ESPN case, which is yet another district court case, excuse me. Can you guys hear us? You can't, you cannot hear me. Oh, I can you hear me now? We can hear right now. I can judge Rovner. I couldn't before. We can't hear you. There's a problem here. Just a minute. Can you hear me now? I heard that. Yes. Not now. Oh, dear. Can you hear me now? Yes. But there's a real, there's now, now, no, there's a real time. Don't worry. Thank you, Your Honor. It seems like the mics are switching back and forth. And when we're talking, it shuts her off. You have a solution? Mr. Van Orden, that may be a good thing. Well, I want to hear your questions, Your Honor, so I can give it my best shot. No, no, I, that was a joke. Ho, ho. Why don't you try asking it, Judge Rovner? So, because occasionally we do hear you. My question was whether, well, my question was that the defendant's actions at issue under the contract, of course, are its continued use of the railcars after Avantime's breach. But how can we be certain that the use of the railcars was an action pursuant to this contract, to this contract? Yes, that's a good question, Your Honor. Avantime, my client, had the rights to these railcars. It had that both under the original distribution agreements and then under the termination agreements. Were they specifically numbered railcars? I seem to remember an attachment to a contract. Yes, there were. Both in the termination agreements and there, they were specifically numbered. And it's undisputed that the railcars that were used by Glacial Lakes here were the railcars covered by this contract. Particularly identified railcars. That's right. And there's no dispute about that, Your Honor. And so the... But if the defendants wanted to elect the remedy of terminating the contract entirely in light of Avantime's breach, wouldn't the defendants still need to transport the ethanol and wouldn't those railcars be the most likely means that they would use regardless of whether the contract was in place or not? Well, they certainly did need railcars. And that's really what drove this deal, is that they needed the railcars and they couldn't line them up in the time they had. They had... That's what gave Avantime the negotiating leverage it had to do the deal. And that's why it was there to assign it. Avantime had the rights to them and it had to agree to assign all of these railcars for Union Tank and the others over and it did so. That was part of the terms of the contract. And so under this situation, I don't... If they had terminated this contract entirely, I think what would have happened is we would have reverted back to the distribution agreements. But that's certainly not where Glacial Lakes wanted to be because then it had to keep paying commissions to Avantime and it had to pay for the railcars there. So it couldn't go back there. That's why... And the other thing that's happening right now is this is all happening in January, February, and March of 2009 when the market is crashing. Everything is going to pieces. Glacial Lakes was on a very tight cash flow and it couldn't afford not to have railcars. So that's what was beyond this. That's what drove their decision to affirm and keep doing it. They thought legally they had the right to affirm and keep using those without honoring their own, but that's just wrong under New York law. As I was saying to your honors, Glacial Lakes doesn't cite any authority whatsoever for the proposition that this is only defensive. The treatises it cites are about the pleading election of remedies as a pleading matter and not limited to contracts as what do you do at the beginning when somebody is pleading inconsistent theories generally. Why isn't this implicit though when you look at cases that say things like the non-breaching party must choose between two parties? To me that suggests that the non-breaching party is either the plaintiff or perhaps a counterclaim plaintiff, which as far as I'm concerned is much the same thing. It doesn't say anything about when somebody breaches a contract and they're sued for breach of contract, they get to direct the remedy in a way that's favorable to themselves. I'm not sure if I'm following entirely, your honor, but in all of these cases that we cite, the six ones that I listed here, including the Second Circuit, there are people suing them. Both sides are suing each other. And the courts apply this doctrine equally to both ways depending on which duty is at issue. It did that in Marvel and it did that in the ESPN case as well. And the doctrine is very simple. It's that either there's a contract there or not. And if there is, then everybody's bound to perform. And they're liable to be held subject for breach on each of their own obligations that they didn't perform. Do you think there should have been a counterclaim against you then for the true up money that you didn't pay? We've conceded there's a set off for that, your honor. They didn't have to sue for it because we conceded it's there. But in the part of the damages that are undisputed here, there's a chart in the middle of our brief that applies those set off amounts. So absolutely. Right. I remember that. Yep. Absolutely. They can sue us for it. You know, the defendants informed Aventine, of course, that they didn't intend to proceed with the additional provisions of the termination agreement until the past amounts were received. Does that in any way indicate an intent to terminate the contract entirely? In which case, the use of the railcars could be considered an action that is independent of that contract and rather between the defendants and Union Tank. Union Tank. Yes, your honor. That same fact pattern came up in both the case. And the rule under New York law is you can say you're terminating, but then if you keep performing, you affirm it. It's the conduct that controls. And like I said, the same thing happened there because Marvel said it was terminating, but then ARP kept accepting the benefits and it kept going. And then in ESPN versus baseball, there was a claim termination, but they kept accepting the benefits there. So the conduct controls in this. And so they could say, you know, demand performance under this, but once they kept accepting the railcars, that controlled as a matter of New York law. Let me turn your honor to the second set of issues here. If there is liability, one set of damages just follows with it because the amounts are undisputed and no issue has been preserved. That's the commissions versus your true up payments. That's the commissions. And then there's part of it is that there are sublease railcar payments that were due and not paid before Aventine went into bankruptcy. And so those are part of that chart. So all of that just follows along. But the bigger portion of the damages is the amount that came from Union Tank. The 2.3 million. That's exactly right. And as to that, much of it, all the facts are undisputed. It's undisputed that there was a breach because Glacial Lakes had a duty to pay the leases and it didn't. And it had a duty to get a complete release for Aventine from Union Tank and it didn't. And then once Union Tank sued, it had a duty to pay the leases and it didn't do that either. All of that is undisputed. And the amounts are undisputed because it was stock that was paid out and the valuation is conceded. So what your opponents argue, though, is suppose there are, you know, it doesn't matter, 100,000 shares of stock and they're going to be divided up among the creditors in the bankruptcy according to the amount of the debt in the various classes. And so your opponents say, what's it to Aventine if UTC has 2.3 million, whatever that turned out to be, in number of shares versus somebody else? You still were going to have that many shares outstanding. There was still going to be whatever dilution or non-dilution there was. And maybe one creditor would have a gripe about that allocation. But why does it affect Aventine? Yeah, you're right. They very effectively say that arguments about how this should be distributed among Aventine and its creditors and shareholders wipe out the injury altogether. I think that's slight of hand because the undisputed facts there are over on this side is Glacial Lakes and Aberdeen and they have a duty to pay some group of people on this side. And they didn't do it. Well, they didn't do it, but they gave them stock as under the supervision of the bankruptcy court, which didn't, as far as I can tell, cost them a nickel. They got the release that they needed in bankruptcy. Whatever the valuation of that stock is, why is that their issue? Well, this claim clearly does belong to Aventine and not to anybody else. What would it have looked like if Glacial Lakes had indemnified? There'd still be the same number of shares of Aventine. This was hardly a hundred cents on the dollar resolution of the bankruptcy. That's entirely correct, Your Honor. But what would have happened had Glacial Lakes paid ahead of time is that Aventine would have been better off because its net worth would have been higher. Yes, it still would have gone through bankruptcy, but all of its creditors would have gotten more value by the amount that it paid because it would have had more assets compared to its liabilities. That's the injury, Your Honor, is that it had this legal right to this money and it didn't get it. No, it was down the line that you're looking at. You're looking down the line. Well, Your Honor, and that's another thing that, yes, the Glacial Lakes... We're still having problems with this sound. I think I understand your question, Your Honor, Judge Rovner, about this is a timing thing. We're pursuing it later rather than then. And as to that, the timing doesn't matter. Had we gotten the money then, we clearly would have been better off. If we get the money now, we're clearly going to be better off. Well, you still would have given all of it away to somebody. It's just that some of the people you were giving it to would have gotten more. Well, we would have given the stock away. Yes, those were going to be our owners, but the money would have come to Aventine and it would have been in Aventine's coffers and Aventine would have been worth more. To be distributed to creditors. Well, yeah, not the cash though, remember, because the bankruptcy was set. So here's what's going on, Your Honor. There isn't any issue. It's undisputed that this claim belongs to Aventine. It has the contract. It has the right to sue. This is not a claim by the creditors or the shareholders. Then in the bankruptcy, the claim was assigned to Aventine to come out the other end. And the creditors all agreed with that. Any one of those creditors, they could have bought that claim or Glacial Lake could have settled it or they could have objected to Aventine getting it, but they didn't. So the legal right belongs to Aventine. It's Aventine's legal right right now. And in terms of the value, if it sues right now, it obviously is better off. It gets the money. But its creditors are better off, too, because Aventine is now worth more and the creditors, now shareholders, enjoy that value. So everybody, and that's why I said this, the fight in this case is about whether money is going to come from this bucket over here at Glacial Lakes and Aberdeen to this bucket over here, which is Aventine and its shareholders. And in this gap here, there's no dispute whatsoever that the people on this side, Aventine and all those folks are the ones entitled to this money, not Glacial Lakes. They had a contract. They breached it. They had that duty. And there's no way to argue out of Aventine being better off if it gets the damages it's related to. Everything else is this argument about how you allocate it. Is it really the shareholders' claim? No, it's Aventine's. It was the party to the contract, and it got it assigned to it in bankruptcy, and Glacial Lakes didn't object to that. It just preserved its set-off rights. And the creditors didn't object to that. They agreed it went to Aventine. There's no dispute this is Aventine's. And now where's the money going to come? It's going to come to Aventine. It's not going to get paid to the shareholders directly. They get the indirect benefit. So it's really not the stock you're arguing about. It's the preservation of the cause of action for post-bankruptcy. Well, there's the preservation, which is conceded, but the real issue is injury under New York law. That's a question of New York state law. Is what happened here an injury? Sure it was. We were entitled to the money and we didn't get it. That's as clear and easy an injury as you get. And all of this about where it goes is just slight of hand, trying to say, moving it from one bucket to another, but ultimately they can't dispute who owns the claim and where the money's coming to. Preserve the rest of my time for rebuttal, Your Honor. Okay. Thank you. Ms. Vares. Good morning. May it please the court, counsel. My name is Carla Vares and I represent Appellee's Glacial Lakes Energy and Aberdeen Energy. Your Honor's the outcome of this case, you use the rail cars free. Your Honor. I think there's, there's two responses to that question. One is legal and the other is factual from a legal standpoint. Um, as the court is aware, the purpose of a breach of contract action is to put a plaintiff in the same position that it would have been in had the opposing party performed. That's where Aventine sits today. The, the, uh, factual response. Maybe I'm being simple minded. Um, you had a claim, you had a claim against Aventine. Um, they owed you money. On the other hand, you're using these rail cars and, um, you owe them money for that. And why aren't they, why don't you just, why aren't these two claims simply netted out? That's the end of it. Your Honor. I think as to the sort of equitable question that I, that I think you're getting at, there's a, there's another side to that coin that the district court did not pick up on or, or discuss in its opinion. And that is the fact that Aventine, at the same time that my clients were in fact using rail cars, Aventine received the benefit of about a third of its clients that it's never paid for. Look, that's fine. Those are offsetting claims. Your Honor. I, their calculation is that, uh, uh, their claim for the use of the rail cars against you is larger. Well, that, you know, it's a factual question. Who owes whom? But it seems to me you have these both companies having what appear to be valid claims against the other. Um, the only, the only thing that remains to be done is to set off the claims, see who has a net obligation to the other party. Your Honor. And I think for the answer to that, we look back to the party's agreement and the way that the parties understood and interpreted their own agreement. I don't understand. On what, what basis do you have for thinking that Glacial Lakes would be entitled to use the rail cars without paying anything for them? Where was that in their understanding? Sure. Your Honor. I think the question, um, assumes the fact that if my clients hadn't been using the rail cars, one that Aventine would have wanted them back, which is not established, that's nowhere in the record because the reality was Aventine, um, wanted to get out of this relationship with my clients. It only had these rail cars under lease. Wait, do you think you were doing them a favor by using their, their, their rail cars without paying for them? That's a favor? No, but I think, I think the other important fact to keep in mind is at the same time that Aventine is... What's the first important fact? The first important fact was that Aventine didn't want these rail cars back because it had no use for them. Once it, once my clients were no longer part of its ethanol pooling and marketing alliance... But you're using their rail cars. And, um, if they, they may not have any use for them, but they'd like to have the rail cars so they can, you know, rent it, lease them to someone else. Exactly. They could have subleased them to someone else. And for all we know, they could have negotiated some return to UTC. Uh, we don't know what would have happened if you had not decided to use them. To me, it looks as if you had your cake and you ate it too, because what you did was you enjoyed all the remaining benefits of the contract with no liability for any default of yours and still suing the first party for its You didn't argue to us that your actions in, uh, using the rail cars were independent from the contract or an attempt at mitigation or are consistent with having terminated the contract. So it seems to me at this point, uh, but you know, I'm very happy to hear your response is that we can properly interpret your actions as performance under that contract. Your Honor, I think there are two parts to this. One is, um, at the same time that Aventine is saying that my clients were in breach for failing to pay for these rail cars, Aventine was likewise in breach of its contract with Union Tank Car. But they offered the offset. They, when they first failed to make the true up, they said, you know, we're 2.25 million from you to the extent it was an offset. So it wasn't really a something for nothing. Well, and that's a good question, Your Honor. Um, and I think the fact that the parties discussed an offset with each other at the point in time when they did, uh, and this issue came up, uh, in early March of 2009, there was an exchange of emails between Aventine, uh, and my clients. The records are at, uh, uh, docket numbers 25-8 and 25-9, where Aventine is, is affirmatively reaching out to my clients and proposing what is in essence, a new agreement to offset, or they say net out the amounts that are owed from one side to the other and vice versa. At the same time that email comes from, from your client saying basically we don't have to pay them anything, uh, as long as they're in breach. Your Honor, I think that's what we're challenging. Sure. My clients continued to hold out hope. And I think all parties did that Aventine would ultimately make the payments that were due, the true up payments that were due to my clients, everyone wanted this agreement to continue forward and for all parties to perform. I don't think there's any question about that. I think there is a question about that. Well, well, the fact is Your Honor, approximately, I mean, it was about six debts, right? That's the sensible thing. Two people owe each other money. You want to net out, so you just have one payment, right? Well, Your Honor, I think what these, what the record shows, um, in the, in the documents that I just cited is that the parties never intended or understood that their agreement encompassed, uh, the right to set off amounts that are owed from one side to the other. Well, that doesn't make any sense. I don't understand you. If two people owe each other money, one can't say, well, I don't, I don't, I don't like this. I don't want, I don't want to, I don't want to pay you. I just want to be paid by you. I know I owe you money, but I don't want to pay it. Your Honor, I think it's also helpful to keep in mind, uh, the relative amounts that were in dispute that were owed from one side to the other at that in between when Aventine, uh, first breached the termination agreements by failing to make these payments and when Aventine entered bankruptcy. But I think this argument of yours is actually quite inconsistent with your argument in response to, um, your opponent's effort to show that the, uh, obligations under the contract are divisible. I'm actually quite skeptical about that based on everything that you've been saying and everything. He said, but in fact, it was really just one big agreement to, to disentangle these two companies. Uh, and what I'm looking at, you've quoted or it's quoted on page eight of your opponent's opening brief where, um, the person from Glacial Lakes says, um, the, the director of risk management says, I understand that Glacial Lakes is utilizing the cars per our agreement with Aventine, blah, blah, blah, until our funds are paid in full, Glacial Lakes Energy is under no obligation to make these rail car payments. That's just sort of out of the blue. I mean, that's, that's the hypothetical Judge Posner was just giving you. We've just decided not to pay. Uh, that's true, Your Honor. That's, that is what my client said in response to that question. So the contract, I go back to my other point. Another way of looking at this is if the contract was completely over at the time of the breach, you'd still have to make the $897,000 in some payment. At that point, there's got to be some unjust enrichment claim because there's no contract and you'd still have to pay them. So I don't know that that makes you much better off. Your Honor, I think the fact that my clients continued to be in touch with Aventine in the weeks following Aventine's breach and continued to ask when payment would be received is evidence enough that neither side understood that the, that the termination agreements, uh, had been terminated themselves as a result of Aventine's breach. My clients continued to... Forgive me, but help me with this. What case can you point to in which one party breached a contract and then the non-breaching party was allowed to continue to enjoy the benefits of a its contractual obligations? That's a great question, Your Honor. And this, this is an important point that I want to be sure to emphasize this morning. This goes to the election of remedies doctrine that Aventine, uh, cites and relies upon, uh, in an attempt to excuse its own lack of performance in this case. Now, probably the case that's most heavily cited and discussed by Aventine in its briefs is the ESPN decision. And I want to draw the court's attention in particular to page 401 of that case, because counsel is correct. This is the ESPN versus office of commissioner of baseball case. This is a Southern district of New York case from 1999. Counsel is correct that this is a case, just like all of these election of remedies cases. This is a case where there were claims running in both directions. And so I think sometimes in this context, it is hard to sort out exactly how the doctrine of election of remedies is being applied. And so the court in ESPN case goes through the analysis in both directions because it appears that it was raised as an affirmative defense by both sides. The court finds that ESPN did as a matter of law breaches contract with major league baseball. But then it gets to an important section at page 401. The court says that ESPN self-help in other words, exactly the type of action that Aventine is complaining about my clients having taken in this case. ESPN self-help amounts to nothing more than a breach. And the court says, my ruling that ESPN breached the agreement as a matter of law eliminates the need to prove the third element of a breach of contract action breached by the other side. But the court goes on to say, in order to maintain a breach of contract claim, however, baseball must also prove the second element listed above, performance of the contract. And there was a fact dispute that the court did not reach in this decision that was left for trial. And the question was as to the actions that baseball took, whether baseball's actions amounted to a material breach or whether they were justified. Because Aventine was willing to make these true up payments, but on the other hand, it also had a right, I think, to, you know, to the rental fees for the real cars. Two things there. Is there some reason, I'm forgetting about legalisms, is there some reason that a lay person could understand why Glacial should be allowed to use these real cars without paying for them? Again, Your Honor, I do want to come back and emphasize the point that at the same time Aventine is complaining about my clients having received the benefit of these real cars, Aventine likewise received the benefit of over a million dollars worth of ethanol from my clients. Of course it is, but that's the offset issue. Correct. You didn't even want the offset. That's what's so troubling about your position. You wanted, you took Aventine's failure to make this one payment as a ticket to use all of these real cars, 433 of them or whatever the number was, 473 of them, for free and the amount was actually something that didn't, that Aventine could have offset and you still would have owed it money. Um, as of that point in time, Your Honor, that's not actually correct. And I think this is where I think it's important to keep in mind the relative amounts that were due from one side to the other at the time. At the, the payment that was missed was $897,522.59, right? Two payments, but they added up to that. I believe the two payments added up to about $992,000 to my clients. Well, um, close, close enough, $890,000 or so. I don't, I don't think it was quite that high, but, um, but anyway, the fee for the foregone sales revenue was $1.25 million. So even if we use your number, um, Glacial still owed Aventine money plus, you know, the sublease of these rail cars, they were an asset. Aventine may have used them some other way, but you just thought, well, you know, we get this free asset. Your Honor, at the time that these payments were missed by Aventine, and again, this was about February 23rd. The next payments that would have been due under the contracts were the termination fees on March 1st in the amount of $50,000 from each of my clients to Aventine. As I said, my clients continued to hold out hope that Aventine would ultimately perform and would make the true up payments and that all, that all the parties could continue on their way as they had originally agreed to. But that's not what happened because six weeks later... Were they expecting that they would then pay for the rail cars? Yes. I mean, it's a crazy decision. Your Honor, I think it's important to keep in mind though, that... The rail cars, as soon as it received the true up payments. Is that what you're saying? Your Honor, my clients remained willing... Is that what you're saying? Correct. That is what I'm saying. But that, I mean, my God, who would negotiate something like that? Your Honor, the parties agreed to the arrangement that they did. And I understand the court's questions regarding the issue of set up. Are you saying that there was a contract which required that the true ups be paid before Glacial paid anything for using the rail cars? Is that what you're saying? Each of the payments... Is that what you're saying? Yes. Under the circumstances it is. Because the agreement called for the termination payment, or pardon me, the true up payments for the ethanol to be made in the ordinary course that they would have been under the original marketing agreements between the clients. I believe... What about the payment for the rail cars? The payments for the rail cars... Wasn't there, weren't there due dates for that? There were. That is correct. So what's the problem? Each owed the other. Again, why can't they be netted out? Because the party's agreement did not call for a net out sort of arrangement. What difference does that make? You think you can steal because there wasn't an explicit reference to netting out? You can steal from someone you owe money to? The evidence, Your Honor, I think is in the fact of how the parties understood their agreement. Do you think your position is ethical? Yeah, that's what's my point. Your Honor, I think our position... What are the ethics of it? Forget about the law for a moment. It's ethical that Glacial gets the money that it's owed and doesn't pay its debt to the person who gave it the money? Yes, because I think the other side of that is the fact that if we're going to consider that unethical, then I think at the same time we have to consider it unethical that Aventine received the benefit of a million dollars worth of ethanol from my clients that they otherwise would have been able to sell on the open market to another party that they never paid for. But they were willing to pay for it in the form of the offset. That's the point that you don't want to confront. Your Honor, I think we do have to come back to the ESPN case. Aventine is the first party... So you're pinning all of your hope on a 1999 case from the Southern District of New York? Your Honor, the way in which Aventine is seeking to apply the election of remedies doctrine would eliminate one of the essential elements of a breach of contract claim under New York law. But they're treating the contract as though it's still in existence. That's the problem. If the contract was over, Glacial Lakes wouldn't have had any right to use the rail cars. Because that right stems only from the existence of the contract. So it's Glacial Lakes that's trying, as Judge Rovner put it, to have its cake and eat it too. Your Honor, two things in response to that. One, I think this would potentially be a different case if at this point in time, my clients were continuing to receive additional rail cars from Aventine. But they were not... Well, they're using the rail cars. Correct. They were using... Why do you have to have additional rail cars? They were using the rail cars. You're using the rail cars. You're supposed to pay for using property, right, that belongs to someone else. In the same way that Aventine was supposed to pay for the... Precisely. That's the offset. Two companies owing money to each other. Your Honor, I think... You can support and argue each side of the issue, but here what you're doing, it seems to me, is you're essentially arguing that once Aventine breached the contract, its rights to enforce the contract are totally terminated. But your rights to enjoy the benefits of the contract remain totally intact. And that is, I think, both unethical and unequitable. Your Honor, two things in response to that. One, Aventine has never argued that this is a case where set-off should be applied. What Aventine has instead relied upon is the notion of election of remedies. And I come back to that. I think based on the ESPN... But it acknowledges that it owes you these true-up payments. I think... It just wants its, you know, offsetting compensation for your using the rail cars without paying for them. Your Honor, even at the time when Aventine originally made a proposal to my clients, and this is in docket number 25-8 in the record, even at the time when Aventine proposed a set-off, acknowledging by virtue of the proposal in that document that that would be something outside of the scope of the parties' agreement that would require a new assent from my clients, even when it made that proposal, it understood... First of all, it understood that that was not a part of the agreement, and that's a very important piece. But when it did make that proposal, it did not propose to simply net out the amounts... But you can effect arguing that without an agreement, you can steal money from another company. That's what you're doing. Your Honor, the parties... Using the other company's equipment for nothing. Well, the important thing to keep in mind here is that these rail cars did not actually belong to Aventine. I think this would be a different case... They had the right to use them under the leases. I don't think that matters too much. Well, it's important, though, to remember... UTC wasn't able to assign them to some completely different company in the United States. They had a... Just like all leases of equipment, they had the right. Well, at the same time that my clients were holding out and did not make the sub-lease payments to Aventine, Aventine didn't make the payments to Union Tank Car for those same rail cars. That's reflected in Exhibit 38-2 in the record. I'm not sure that's your client's problem. I think that... I mean, of course, Aventine says it would have. If they'd gotten the proper payments from you, they would have turned them right over to UTC. But anyway, your time has expired, so thank you very much. Thank you. Anything further, Mr. Van Oort? Judge Rovner asked whether counsel could point to any case on this set of facts here where the court had allowed someone to accept the benefits and not pay for them. The answer to that is no. There is no such case. We cited six on the other side, which is why liability is established here. In response to your question, Judge Posner, there is no language making Aventine's payments a condition precedent to the other payments. The relevant paragraph of the contract is paragraph 4, seen in the appendix at 828. There is no such thing. Some of these were just ordinary payments, and so they netted out. Finally, in terms of controlling the railcars, had this actually been terminated, it would revert back to the other distribution agreements. Those distribution agreements, it's docket 25-2 in the lower court record, paragraph 6. Under that, Glacial Lakes had the same duty. If it terminated the distribution agreement, it had an obligation to pay for the railcars then and hold harmless. So it would do them no good to try to back out of this contract. That's why they did what they did. They used the railcars. They affirmed it. And the place we should be is netting out. Your Honors, didn't have any questions about the injury issue in the other argument, and I think we've covered that ground. You know our reasons for why the claim belongs to Aventine, and any issues about distribution were resolved by the bankruptcy plan and the objections. So unless your Honors have further questions, I won't say anything more. Judge Rovner? No, but thank you so much. Thank you, your Honors. Judge Bozer? All right, thank you very much. Thanks to both counsels. We'll take the case under advisement.